**F I L E D**

**UNITED STATES COURT OF APPEALS**

**December 19, 2006**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GERALD P. SMALL, III,

    Defendant - Appellant.

No. 06-1102
(D.C. No. 04-CR-00153-LTB)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **McKAY**, and **LUCERO**, Circuit Judges.[**]

Defendant-Appellant Gerald P. Small, III, pled guilty to three counts of a twenty-two-count indictment charging him with illegal activities relating to millions in fraudulent loans he received through mortgage companies he owned or controlled. Specifically, Mr. Small pled guilty to count 2, making a false claim against the government in violation of 18 U.S.C. § 287; count 4, bank fraud in

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**] After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

violation of 18 U.S.C. § 1344; and count 8, wire fraud affecting a financial institution in violation of 18 U.S.C. § 1343.  He also admitted to count 22, which sought forfeiture of certain property pursuant to 18 U.S.C. § 982.  The district court sentenced Mr. Small to 60 months in prison on count 2, and 101 months on counts 4 and 8, all to be served concurrently.  He was further sentenced to three years of supervised release on count 2, and five years on counts 4 and 8, all concurrent.  The district court also imposed restitution in the amount of $35,279,440.27.

On appeal, Mr. Small challenges his sentence.  Specifically, he contends that the district court erred by: (1) considering facts proven only by a preponderance of the evidence; (2) failing to offset the collateral pledged against the loss proven by the government; (3) applying a two-level sophisticated means enhancement to a crime that merely used fictitious financial statements and several sham companies and that was so unsophisticated that a loan processor with only a high school education detected it; (4) applying a four-level enhancement for Mr. Small's role as an organizer or leader of an extensive criminal operation; (5) failing to depart in recognition of the cumulative nature of the aforementioned enhancements; and (6) failing to credit Mr. Small for the 20 months he spent in home detention during the pendency of his case.  Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we affirm in part and reverse in part.

## Background

I.    The Scheme

Mr. Small, through companies he owned or controlled, devised and perpetrated two separate schemes by which he fraudulently obtained over $255 million in loans from U.S. financial institutions. In the first scheme, which was the subject of counts 4-7 of the indictment, Mr. Small and his associate, Robert Bichon, induced "investors" to submit materially false mortgage loan applications to lenders such as Washington Mutual, Inc., and Colonial Savings, F.A. Mr. Small and Mr. Bichon promised the investors that, if they supplied their good credit, Mr. Small and Mr. Bichon or the entities they controlled would provide a down payment. Once the property was purchased in the investors' names, a "contract for deed" would be executed whereby these entities would manage the properties for two years, guaranteeing that rent payments would satisfy the mortgage obligations. At the end of the two years, the investors would be bought out. Many of the homes purchased were structurally damaged but had been repaired cosmetically for the purpose of obtaining inflated appraisals.

In the specific fraud charged in count 4, an "investor" named Ryan Hall applied for a $680,000 loan to fund the purchase of a home in Greenwood Village, Colorado. Mr. Small assisted Mr. Hall in preparing the loan application, which included a W-2 form falsely indicating that Mr. Hall was employed by Turner Group at a high salary as well as a false bank statement indicating that Mr.

Hall had a high account balance. At Mr. Small's request, Robert Sigg falsely confirmed Mr. Hall's employment when contacted by the lender, Long Beach Mortgage.

To understand the fraudulent wire transfer charged in count 8, some background is necessary. This scheme involved efforts by Mr. Small and his employees to induce Flagstar Bank, FSB ("Flagstar") and IMPAC Warehouse Lending Group ("IMPAC") to provide initial funding for fictitious loans. This scheme began in February of 2003, when Mr. Small obtained a multi-million-dollar warehouse line of credit from Flagstar in the name of Amerifunding, a company that his wife, Kelli Small, nominally owned but he controlled. Flagstar approved the credit line and several increases to it based on personal guarantees from Mrs. Small, which were backed by false financial statements prepared at Mr. Small's direction. IMPAC issued a separate line of credit to Amerifunding based on similar misrepresentations.

Later in 2003, Mr. Small directed Chad Heinrich to purchase Twentieth Century Mortgage, Inc. ("Twentieth Century"), using the proceeds of the fraud against Flagstar. Using the false financial statements that had been prepared for Mrs. Small as a template, Mr. Heinrich obtained a $25 million line of credit from Flagstar at Mr. Small's behest. Then, Mr. Small directed Mr. Heinrich, Charles Winnett, and others of his employees to submit fraudulent home loan applications to Flagstar and IMPAC on behalf of Amerifunding and Twentieth Century. The

- 4 -

loan applications used either wholly fictitious names or the names of people who were neither applying for loans nor purchasing the homes listed in the applications.

Mr. Small also directed the creation of several shell corporations to perpetrate this fraud. First, he had Mr. Winnett incorporate TDF Mortgage Funding, Inc ("TDF"). Amerifunding and Twentieth Century represented to Flagstar and IMPAC that TDF would purchase many of the fraudulent loans once Flagstar and IMPAC provided the initial funding. Mr. Small also directed his subordinates to incorporate Security National Title, Inc., and Chicago Title Guarantee, Inc., using fictitious names. These purportedly independent title companies, which had names very similar to those of two established title companies, were actually controlled by Mr. Small and his associates and acted merely as conduits for funds received from Flagstar and IMPAC.

In December of 2003, a Flagstar loan processor became suspicious of some of the loan applications coming from Mr. Small's companies. After she brought her concerns to the attention of her superiors, Flagstar began requiring Amerifunding to provide copies of applicants' driver's licences along with the loan applications. Mr. Small and his subordinates thereafter began collecting driver's licenses from Twentieth Century employee files and submitting loan applications in those names. Once they had used all of those names, Mr. Small instructed an Amerifunding employee to place false newspaper advertisements for

a position at the company that paid $100,000 per year to applicants with no previous experience. Mr. Small and his subordinates then used the personal information provided by the applicants, who were required to provide copies of their driver's licenses, to obtain more fraudulent loans.

In the specific fraud charged in Count 8, Mr. Small caused or aided and abetted a wire transfer of $460,000 from Flagstar to Security National Title's account at First National Bank of Colorado in Denver. Flagstar provided these funds in response to a loan application submitted in the name of Jeffrey Todd Hood. Mr. Hood had applied for a job at Amerifunding but had no intent to apply for a loan. He discovered that a loan application had been submitted in his name when the loan processor telephoned him to confirm her belief that the loan was fraudulent.

The government calculated that the total loss to Flagstar and IMPAC from the fraudulent scheme directed by Mr. Small was $35,032,080.64. Mr. Small reserved his right to challenge that figure. With respect to the other scheme, the parties agreed that the actual loss was $2,473,597.14. There was no evidence that Mr. Small intended a greater loss than the actual loss in either circumstance.

II.    The Sentence

For counts 4 and 8,[1] the Presentence Report ("PSR") as adopted by the district court concluded that the applicable guideline range was 151 to 188

---

[1] Mr. Small challenges only his sentences for counts 4 and 8.

months and that the sentences should run concurrently, pursuant to U.S.S.G. § 5G1.2(c). It arrived at this calculation as follows. First, the PSR determined that the base offense level for each crime was 7. U.S.S.G. § 2B1.1(a)(1). Second, it determined that a 22-level enhancement applied, pursuant to U.S.S.G. §2B1.1(b)(1)(L), because the loss caused by Mr. Small's offenses was more than $20 million but less than $50 million. Third, the PSR added a 2-level enhancement for sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(9)(C), because Mr. Small had used fictitious entities and corporate shells to perpetrate the frauds. Fourth, the PSR added a 2-level enhancement, pursuant to U.S.S.G. § 2B1.1(b)(13), because Mr. Small received $1 million or more in gross receipts from one or more of the financial institutions that he defrauded. Fifth, it added a 4-level enhancement for Mr. Small's role as the organizer of the offense, pursuant to U.S.S.G. § 3B1.1(a). Sixth, the PSR declined to increase for obstruction of justice despite evidence that Mr. Small lied to investigators before his arrest and then lied to his probation officer about his compliance with the conditions of his pre-trial release. Finally, the PSR deducted 3 levels, pursuant to U.S.S.G. § 3E1.1(a), because Mr. Small accepted responsibility for his crimes and cooperated with investigators. These calculations led to a total offense level of 34. Because Mr. Small had no criminal history points, the PSR determined that his criminal history category was I, resulting in a guideline range of 151-188 months.

As part of its plea agreement, the government agreed to move for a 25

percent downward departure, and it did so at the sentencing hearing. A departure of 25 percent below the guideline range as calculated by the PSR would have left Mr. Small with a sentence of between 113 and 141 months. However, Mr. Small registered several objections to the calculations in the PSR that he now raises in this appeal. According to his calculations, the total offense level should have been 28, which, with a criminal history category of I, would have led to a guideline range of 78 to 97 months. A 25 percent departure below this range would have resulted in a sentence between 59 and 73 months.

The district court rejected Mr. Small's arguments, determining that the proper offense level was 34, as calculated in the PSR, and that the appropriate sentencing range was 151 to 188 months. The court also decided to depart downward; in fact, the court departed 33 percent, resulting in a sentence of 101 months. However, Mr. Small has appealed, arguing that a proper calculation of the guideline range would have resulted in an even lower sentence.

Discussion

"When reviewing a district court's application of the Sentencing Guidelines, we review legal questions de novo and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." United States v. Martinez, 418 F.3d 1130, 1133 (10th Cir. 2005), cert. denied, 126 S. Ct. 841 (2005). Our review of Mr. Small's

contentions was aided because the government provided some of the materials that should have been–but were not–included in his appendix.

## I.  Evidentiary Standard

Mr. Small first asserts that the district court erred by enhancing his sentence based on facts proven only by a preponderance of the evidence.  He contends that it is unconstitutional for a court to enhance a sentence by using facts not proven beyond a reasonable doubt after the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005).  This contention has been examined and rejected in several cases–suffice it to say that the post-Booker advisory guideline regime permits judicial factfinding by a preponderance of the evidence.  United States v. Bustamante, 454 F.3d 1200, 1202 (10th Cir. 2006).

## II.  Collateral Offset

Mr. Small next argues that the district court erred by failing to reduce the amount of loss caused by his fraudulent activities by the amount of collateral pledged to secure the loans.  He contends that the loss amount is below $20 million, which results in an enhancement of 20 levels rather than 22.  Aplt. Br. at 16.  Both parties agree that the district court correctly interpreted U.S.S.G. § 2B1.1 cmt. n.3(E)(ii), when it held that it "must consider collateral that benefits Flagstar in determining the amount of loss.  Simply put, for any collateral value that Flagstar may be entitled to claim, the amount of loss should be reduced by that collateral."  Aplee. Supp. App. at 62.  Notwithstanding, the district court

made no adjustment for the value of any collateral because it deemed the collateral to be worthless. The district court held that Flagstar's security interest in the mortgage loans, related documents, payments, purchase commitments, and any proceeds thereof were all valueless because the mortgages were obtained by fraud and wholly fictitious. Id. at 63-66. The district court acknowledged that Flagstar claimed a senior security interest in many of the assets purchased by Mr. Small, notwithstanding that many of those assets were then subject to a forfeiture proceeding by the government and claims by others. Id. at 63.

We think the district court's methodology is plainly incorrect–Flagstar and IMPAC have argued all along that they have a security interest in not only the funds provided to Amerifunding conspirators but also Amerifunding's negotiable instruments, notes, mortgage loans, accounts, intangibles, receivables, both then-existing and after-acquired, as well as proceeds therefrom. Aplt. App. at 41-45. They also urged a constructive trust theory. Id. at 45 n.9. Subsequently, it appears that the government settled the multi-million dollar forfeiture action in favor of various creditors of Amerifunding (including Flagstar and IMPAC), retaining only $283,000. Aplt. Br. at Ex. 2 at 2. We do not think that the collateral argument can be dismissed so easily.

Mr. Small is correct that the government had the burden of proving the amount of loss, see United States v. Rockey, 449 F.3d 1099, 1005 (10th Cir. 2006), and he is also correct that the loss amount should have been reduced by the

value of any collateral. An incorrect application of the guidelines requires a remand unless we can determine that the error did not affect the sentence imposed. Williams v. United States, 503 U.S. 193, 203 (1992). Although Mr. Small's explanation of how the collateral will bring the loss below the threshold of $20,000,000 is certainly lacking, the government bears the burden of showing that the error in disregarding the collateral was harmless–viz., of showing by a preponderance of evidence that substantial rights were not affected. Martinez, 418 F.3d at 1135-36. We note that one Flagstar estimate of the net loss to all the victims was $22,625,000, Aplt. App. at 37, but in light of the importance of quantifying the amount of loss, we cannot say confidently that the error was harmless given the attendant standard or review. On remand, the district court should quantify the loss reduced by any collateral and, if necessary, resentence Mr. Small. We consider the balance of the sentencing issues in the appeal because they are likely to arise on remand.

III.    Sophisticated Means Enhancement

Mr. Small next argues that the 2-level sophisticated means enhancement was not applicable to him. The district court rejected this argument, finding that the enhancement applied because the scheme employed shell companies, fraudulent financial statements, and other false information. Aplee. Supp. App. at 67. Mr. Small argues that, although the fraud was large, it was unsophisticated, particularly given that it was detected by a loan processor. He refers us to the

Guidelines's definition of sophisticated means–"especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," U.S.S.G. § 2B1.1, cmt. n.8(B)–contending that the definition indicates that "the enhancement is designed to cover a strictly limited subset of fraud offenses and requires the level of means sophistication to be much higher than average for that type of offense." Aplt. Br. at 17.

In response, the government directs us to the rest of Application Note 8, which includes the observation that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1, cmt. n.8(B). We agree that Mr. Small's conduct, which employed such devices as shell corporations, false financial statements and fictitious persons, plainly falls within the definition of "sophisticated." We also reject Mr. Small's contention that the fraud could not be sophisticated because it was detected by a loan processor who noticed unusual patterns and relationships in the data. To the contrary, we think that this case was tailor-made for a sophisticated means enhancement even though the fraud was readily-detectible once the pieces of the puzzle were put together.

IV.    Organizer or Leader Enhancement

Mr. Small next asserts that the district court erred by applying a 4-level enhancement for his role as an organizer or leader of an extensive criminal

activity rather than a 2-level enhancement for being the manager or supervisor of non-extensive criminal activity. In order to apply the 4-level enhancement, the court must find that the "criminal activity . . . involved five or more participants or was otherwise extensive," and that the defendant was an organizer or leader thereof. U.S.S.G. § 3B1.1(a). Mr. Small challenges both determinations, contending that "[t]he government did not prove the requisite level of control, organization, and responsibility for the actions of others," necessary to establish his role, Aplt. Br. at 25, and that the "single-digit figure of Amerifunding employees whose 'unknowing services' were involved in the commission of the fraud is surely not" sufficient to qualify the criminal activity as otherwise extensive, id. at 26.[2]

The Application Notes provide guidance to courts assessing whether a defendant should qualify for the 4-level enhancement. With respect to the defendant's role in the offense:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4. With respect to the size of the offense:

---

[2] Both parties agree that neither of the criminal activities at issue involved five or more criminally responsible participants.

> In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

Id. cmt. n.3. The district court properly acknowledged the factors contained in these provisions, and it evaluated them in determining that the 4-level enhancement applied to Mr. Small. See Aplee. Supp. App. at 68. However, Mr. Small has failed to provide us with the district court's factual findings. Without more, we lack the capacity to review the district court's application of the Guidelines to the facts, and, accordingly, we affirm. We also note that the facts admitted in Mr. Small's plea are more than sufficient to establish his eligibility for the 4-level enhancement.

V.      Failure to Depart for Cumulative Enhancements

Mr. Small also asserts that the district court should have departed downward to counteract the cumulative enhancements it had applied. Mr. Small sought this departure because, he argued, the four enhancements applied by the district court–for the amount of loss, the gross receipts over $1 million, the defendant's role as organizer and leader of the offense, and the defendant's sophisticated means–punish substantially the same conduct. See Aplt. Br. at 27-28. The district court rejected his argument, stating that, as a matter of law, the departures in this case were not cumulative. We review this purely legal interpretation of the guidelines de novo. See United States v. Duran, 127 F.3d

- 14 -

911, 916 (10th Cir. 1997).

We reject the contention that the application of the sophisticated means enhancement in tandem with the amount of loss and gross receipts enhancements constituted double counting. The conduct that qualified Mr. Small for the sophisticated means enhancement was his "hiding assets or transactions, or both, through the use of fictitious entities [and] corporate shells . . . ." U.S.S.G. § 2B1.1, cmt. n.8(B). Thus, it was his <u>method</u> of hiding the assets that mattered. The other two enhancements are concerned solely with amounts of money; the method by which the money was obtained or concealed is irrelevant. Clearly, then, these enhancements do not overlap, are not indistinct, and do not serve the same purpose.

Likewise, the enhancement for Mr. Small's role in the offense is not cumulative. It does not overlap with the others because a defendant could certainly qualify for an enhancement based on his role in the offense even if his means were not sophisticated and he did not qualify for enhancements based on the amount of loss. The organizer or leader enhancement targets conduct–for example, the defendant's decision making authority–that is not contemplated by the other enhancements. Similarly, it serves a distinct purpose from the other enhancements applied to Mr. Small in this case.

Finally, we conclude that the amount of loss and gross receipts enhancements are not cumulative. Although both are concerned with amounts,

one focuses on the overall size of the fraud while the other targets the effect on financial institutions in particular. Therefore, the conduct at issue is not indistinct. Moreover, a fraud could be large enough to call for a 22-level amount of loss enhancement but not qualify for the gross receipts enhancement if the victims were not financial institutions. Thus, the two do not necessarily overlap. They also do not serve identical purposes: one considers the overall damage done by the perpetrator whereas the other considers the degree of damage done to particular victims.

VI.    Failure to Credit Twenty Months of Home Detention

Finally, Mr. Small argues that the district court should have given an additional reduction in light of the twenty months he spent in home detention while awaiting his trial and sentencing.   Mr. Small apparently did not raise this objection at sentencing, so our review is for plain error, and we find none. Nothing in the Guidelines requires a departure for time spent in home detention, and Mr. Small can point to no case–in this circuit or anywhere else–endorsing the proposition that a district court must consider pre-trial detention in arriving at a reasonable sentence.  Instead, he points to two subsections of 18 U.S.C. § 3553(a)(2), which directs the district court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [and] (B) to afford adequate deterrence to criminal conduct."  We find no indication that the court

failed to consider these factors. Indeed, it is possible that the lengthy home detention could have been the reason why the district court departed even further than the government recommended. Regardless, the court was not required to reduce Mr. Small's sentence by the amount of time he spent in home detention.

AFFIRMED in part, REVERSED in part, and REMANDED for resentencing.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge